# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF TENNESSEE

In re

Case No. 09-30164

FUAD REVEIZ

Debtor

TENNESSEE STATE BANK

Plaintiff

v.                                                      Adv. Proc. No. 09-3185

FUAD REVEIZ

Defendant


## M E M O R A N D U M


**APPEARANCES**:    WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
J. Michael Winchester, Esq.
Melinda Meador, Esq.
Suite 1000, First Tennessee Plaza
800 South Gay Street
Knoxville, Tennessee  37929
Attorneys for Plaintiff

HAGOOD, TARPY & COX, PLLC
T. Lynn Tarpy, Esq.
Allison S. Jackson, Esq.
Suite 2100, Riverview Tower
900 South Gay Street
Knoxville, Tennessee  37902
Attorneys for Defendant


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint to Determine Dischargeability of Debt (Complaint) filed by the Plaintiff, Tennessee State Bank, on October 23, 2009, asking the court to award it a judgment against the Defendant and for a determination that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2) and/or (a)(6) (2006). The trial was held on March 7, 2011. The record consists of seventeen exhibits stipulated into evidence, the stipulated testimony of Lewis P. Snyder, a certified public accountant involved with forensic accounting, admitted into evidence during the trial held on July 19, 2010, in adversary number 09-3170 styled *Construction Design and Management, Inc. v. Fuad Reveiz*, and the testimony of three witnesses, Richard Clarke, Mark S. Matlock, and the Defendant.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (2006).

**I**

On November 9, 2006, the Defendant, individually and in his capacity as Managing Member of Reveiz and Gibbs, L.L.C. (Reveiz & Gibbs), entered into a Construction Loan Agreement with the Plaintiff under the terms of which the Plaintiff agreed to loan the Defendant and Reveiz & Gibbs up to $3,425,500.00 for the construction of a condominium project on real property located at 224 Maggie Mack Lane, Sevierville, Sevier County, Tennessee 37862, and otherwise known as the Wisteria Point Condominium Development (Wisteria Point Project).[1] TRIAL EX. 1. Under the terms of the Construction Loan Agreement, the Defendant and Reveiz & Gibbs agreed, *inter alia*, to the following terms: (1) the Plaintiff's disbursements of proceeds were not to be deemed an approval

---

[1] H. Barry Gibbs, the other member of Reveiz & Gibbs, was also a "Borrower" under the Construction Loan.

of work performed; (2) the Defendant and Reveiz & Gibbs were obligated to use the loan proceeds exclusively for the Wisteria Point Project, although the Plaintiff was not obligated to ensure loan proceeds were applied properly; (3) the Plaintiff assumed no liability or responsibility for construction and/or inspection of the Wisteria Point Project; and (4) the Plaintiff was not required to advance loan proceeds in the event of a default. TRIAL EX. 1. Additionally, as required by paragraph 1.4 of the Construction Loan Agreement, Reveiz & Gibbs opened a "Construction/Building Checking Account" under the name of Reveiz and Gibbs, LLC Construction Account (R & G Construction Account) which was to be used "solely for deposit and disbursement of funds associated with this construction project," TRIAL EX. 1, and into which all funds associated with the Wisteria Point Project, including those for the purchase of the land and associated closing costs, were deposited by the Plaintiff. See COLL. EX. 11. Pursuant to paragraphs 1.8 and 5.3, respectively, of the Construction Loan Agreement, "[t]he proceeds of the loan [were] to be used solely for construction on [the Wisteria Point Project]" and "in no event shall [Defendant and Reveiz & Gibbs] use any loan proceeds for personal purposes." TRIAL EX. 1.

In early November 2006, after excavating and preparing the site, Reveiz & Gibbs, through the Defendant as Owner/Partner, entered into a contract "made as of" October 30, 2006, with Construction Design and Management, Inc. (Construction Design and Management), a general contractor, through its President, Mark S. Matlock, to build the Wisteria Point Project, which began approximately five months after the Plaintiff approved the loan. See TRIAL EX. 2. Between May 2, 2006, and February 13, 2007, Reveiz & Gibbs requested eight draws from the Plaintiff on behalf of Construction Design and Management and paid it approximately $959,453.00 from the proceeds of

3

the Construction Loan.  *See* COLL. TRIAL EX. 4; COLL. TRIAL EX. 16.  The Plaintiff also funded an

additional amount for development costs, site excavation and preparation, and the installation of

underground utilities.  *See* COLL. TRIAL EX. 11.

In mid-March 2008, Reveiz & Gibbs submitted to the Plaintiff a draw request dated

March 13, 2008 (Draw #9) from Construction Design and Management in the amount of

$189,982.80 for work performed on the Wisteria Point Project, together with a draw request from

Reveiz Homes[2] dated March 8, 2007, in the amount of $13,000.00 for the "underground electrical."[3]

*See* COLL. TRIAL EX. 4.  Following receipt of a March 20, 2008 letter to the Plaintiff from Barber

McMurray architects that the amounts requested were reasonable, the Plaintiff made two deposits

of $189,982.80 and $13,000.00, respectively, into the R & G Construction Account on March 25,

2008.  *See* COLL. TRIAL EX. 4; COLL. TRIAL EX. 6.  The Defendant did not, however, remit any

portion of the $189,982.80 from Draw #9 to Construction Design and Management; instead, he

issued check #10018 from the R & G Construction Account on March 21, 2008, payable to Reveiz

Homes in the amount of $130,000.00, which he deposited on March 21, 2008, into the Reveiz

Homes bank account at the Citizens Bank of Blount County (CBBC).[4]  *See* COLL. TRIAL EX. 6;

COLL. TRIAL EX. 15.  Thereafter, on April 4, 2008, the Defendant wrote check #10019 out of the R &

_____

[2] References to Reveiz Homes are to Reveiz Homes, LLC, another limited liability company managed and operated by the Defendant.

[3] At trial, when questioned about the date of the Reveiz Homes draw request, Mr. Reveiz testified that it was a typographical error and that it should have been dated 2008.

[4] Clearly, the March 21, 2008 date predates the March 25, 2008 deposit of the $202,982.80 attributable to Draw #9 and the $13,000.00 Reveiz Homes draw.  It is, however, undisputed that the $130,000.00 paid to Reveiz Homes came from the $202,892.80 deposit because, prior to that deposit, the balance in the R & G Construction Account was $378.97, and no additional deposits were made into the account in March 2008.  *See* COLL. TRIAL EX. 6.

G Construction Account in the amount of $50,000.00 payable to Reveiz Homes which was deposited into the same Reveiz Homes bank account at CBBC on April 7, 2008.[5]  *See* COLL. TRIAL EX. 6; COLL. TRIAL EX.15.

When Construction Design and Management failed to receive payment from Reveiz & Gibbs of the $189,982.80 attributable to Draw #9, its president, Mark S. Matlock, called a meeting with the Defendant.  Mr. Matlock testified that he asked the Defendant, "What's going on with the draw," and that Mr. Reveiz said, "I had to use your money for other things."  At trial, the Defendant testified that the $189,982.80 represented a loan from Construction Design and Management, but Mr. Matlock testified that no such agreement or discussion about a loan took place.  Neither the Defendant, Mr. Matlock, nor anyone else associated with Construction Design and Management or Reveiz & Gibbs notified the Plaintiff that Construction Design and Management was not paid for Draw #9.  Following their discussions, Reveiz Homes check #30198 in the amount of $40,000.00 was deposited into the R & G Construction Account on April 24, 2008, and, via check #10028 dated April 22, 2008, Reveiz & Gibbs paid $50,000.00 of Draw #9 to Construction Design and Management.[6]  *See* COLL. TRIAL EX. 6; COLL. TRIAL EX. 15.  Four additional draw requests, nos. 10-13 dating from April to July 2008, totaling approximately $950,245.00, were paid to Construction Design and Management as requested.  COLL. TRIAL EX. 4.

---

[5] *See infra* n.6.

[6] The only other deposit to the R & G Construction Account during April 2008 was a $160,001.10 deposit by the Plaintiff on April 18, 2008, representing Draw #10.  This draw was properly paid to Construction Design and Management by Reveiz & Gibbs via check #10027 also dated April 18, 2008.

On August 5, 2008, Reveiz & Gibbs defaulted under the Construction Loan Agreement by failing to make its quarterly interest payment to the Plaintiff, and on August 6, 2008, Reveiz & Gibbs advised Construction Design and Management that the Plaintiff had rejected its fourteenth draw request in the amount of $373,956.30 due to the insufficiency of Construction Loan proceeds to fund the draw. Following the denial of the August 2008 draw, Construction Design and Management stopped construction of the Wisteria Point Project on August 15, 2008. Mr. Matlock testified that his company was owed a total of $917,824.00 for work previously completed but not paid.[7] When work stopped on the Wisteria Point Project, Construction Design and Management estimated it had completed 84% of the project, although the Plaintiff estimated completion was between 75-80%.

As of September 9, 2008, the Plaintiff had advanced proceeds of the Construction Loan in the amount of $3,053,177.99. *See* TRIAL EX. 10; TRIAL EX. 17 at pg.56, ln.10-12. On September 10, 2008, the Plaintiff, through Richard Clarke, its Executive Vice President, sent a letter to the Defendant and Mr. Gibbs confirming a meeting held on August 27, 2008, discussing the status of the Wisteria Point Project and advising that past due interest on the Construction Loan in the amount of $55,112.22 must be brought current within ten days. TRIAL EX. 10; COLL. TRIAL EX.11. Negotiations between representatives of Reveiz & Gibbs, the Plaintiff, and Construction Design and Management concerning the status of construction and the estimated funds necessary for completion of the Wisteria Point Project proved futile, and on December 23, 2008, the Plaintiff conducted a foreclosure of the real property securing its Deed of Trust, at which it was also the high bidder,

---

[7] Draw request #15, submitted by Construction Design and Management on August 24, 2008, states that the balance to finish the project, including retainage, amounted to $866,861.60.

purchasing the property for a credit bid of $2,200,000.00 which left a deficiency balance of $1,090,081.19 plus interest due on the Construction Loan.

The Defendant filed the Voluntary Petition commencing his bankruptcy case under Chapter 7 on January 15, 2009, and the Plaintiff timely filed the Complaint initiating this adversary proceeding on October 23, 2009, averring that the Defendant falsely represented that he was using the Construction Loan proceeds exclusively for the Wisteria Point Project upon which the Plaintiff reasonably relied to its detriment, and that the Defendant intentionally and knowingly converted Construction Loan proceeds in disregard of the Construction Loan Agreement.  Based upon these averments, the Plaintiff seeks a judgment in the amount of $330,698.00,[8] representing the $139,982.80 balance from Draw #9 not paid to Construction Design and Management, the $13,000.00 for underground electrical work paid to Reveiz Homes in conjunction with Draw #9, and $177,715.20 reflected on Trial Exhibit 8 in unaccounted for monies which the Plaintiff avers were converted and/or fraudulently obtained, along with a determination that the judgment is nondischargeable.

## II

The Plaintiff seeks a judgment against the Defendant along with a determination that the judgment is nondischargeable under 11 U.S.C. § 523, which, as material to this adversary proceeding, provides:

---

[8] This figure is less than the $373,318.82 amount that Mr. Snyder testified he was unable to account for in his analysis.  *See* TRIAL EX.17 at pg. 69, ln.11-14.

(a) A discharge under section 727,[9] . . . of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a).  Courts construe § 523(a) liberally in favor of debtors and strictly against the party seeking a determination of nondischargeability, who also bears the burden of proving the necessary elements by a preponderance of the evidence.  *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).  Additionally, the bankruptcy court possesses both the jurisdiction and the authority not only to adjudicate the Plaintiff's claims but to award any necessary damages as measured by state law. *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)).

---

[9] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C. § 727(b) (2006).  This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge.  *Buckeye Retirement Co., LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S. Ct. 695, 699 (1934))).  The Defendant has not yet received a discharge in his case.

**A**

In order to satisfy the requirements of § 523(a)(2)(A), the Plaintiff must prove the Defendant

obtained money, property, or services through material misrepresentations that he knew were false

or that he made with gross recklessness, that the Defendant intended to deceive the Plaintiff, that the

Plaintiff justifiably relied on the Defendant's false representations, and that the Plaintiff's reliance

was the proximate cause of its losses.  *McDonald v. Morgan (In re Morgan)*, 415 B.R. 644, 649

(Bankr. E.D. Tenn. 2009).

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create
> and foster a false impression, as distinguished from a "false representation" which
> is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice,
> trick, or design involving direct and active operation of the mind, used to circumvent
> and cheat another—something said, done or omitted with the design of perpetrating
> what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760 (citations omitted).  "[F]alse representations and pretenses encompass

statements that falsely purport to depict current or past facts," *Peoples Sec. Fin. Co., Inc. v. Todd (In*

*re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983), and fraudulent intent may be "inferred as a

matter of fact" based on the totality of the circumstances when the defendant has engaged in conduct

that was somewhat "blameworthy."  *Copeland*, 291 B.R. at 759.  Nevertheless, mere negligence or

evidence of "[a] 'dumb but honest' [debtor] does not satisfy the test."  *Copeland*, 291 B.R. at 766

(quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)).  In the Sixth Circuit, courts are

to employ a subjective standard to determine intent.  *Rembert*, 141 F.3d at 281.

> A subjective approach, of course, requires that the trier-of-fact focus solely on the
> individual characteristics of the debtor.  Yet, like an objective approach, a subjective
> approach still entails the utilization of circumstantial evidence given that a debtor
> will rarely, if ever, admit to acting in a fraudulent manner; helpful in this regard are
> many of the traditional indicia of fraud—e.g., a suspicious timing of events,

9

insolvency, transfers to family members or other insiders.  In utilizing such indicia, however, the Sixth Circuit cautioned against "factor-counting," instead holding, "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."

*EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (quoting *Rembert*, 141 F.3d at 282; other citations omitted).

The court must also find justifiable reliance; i.e., the party seeking a determination of nondischargeability actually relied on the representations and, based upon the facts and circumstances known at the time, its reliance was justifiable.  *Morgan*, 415 B.R. at 649.  In short, a determination of nondischargeability under § 523(a)(2)(A) requires a plaintiff to prove fraud in the inducement and often comes down to the defendant's conduct prior to, at the time of, and subsequent to the representations at issue and which witnesses are the most credible.  *Copeland*, 291 B.R. at 766; *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001).

The Plaintiff argues that the Defendant's conduct in taking draws and using the funds for projects other than the Wisteria Point Project constitutes actual fraud under § 523(a)(2)(A).  On the other side, the Defendant argues that he may have inadvertently breached the Construction Loan Agreement but that his actions do not rise to the level of fraud and that it was only after the Plaintiff paid over the money that he "borrowed" it from Mr. Matlock.  He also argues that he never had any intention of not repaying Draw #9 to Construction Design and Management, nor did he ever intend not to repay the Plaintiff under the terms of the Construction Loan Agreement.  Finally, the

Defendant argues that he used the money for construction purposes, even if not for the Wisteria Point Project.

There is no dispute that the Construction Loan required the Defendant and Reveiz & Gibbs to use the loan proceeds solely to fund the Wisteria Point Project. There is also no dispute that the Defendant made draw requests and received funds from the Plaintiff for work performed by Construction Design and Management on the Wisteria Point Project that he did not pay to Construction Design and Management. Under the terms of the Construction Loan Agreement, Reveiz & Gibbs was required to open the R & G Construction Account. The Construction Loan Agreement also granted the Plaintiff a security interest in the real property upon which the Wisteria Point Project was to be built. Neither the Defendant nor anyone with Construction Design and Management informed the Plaintiff that the proceeds of Draw #9 disbursed to Reveiz & Gibbs had not been paid to Construction Design and Management, and, as testified by Mr. Clarke, the Plaintiff justifiably relied upon all draw requests submitted by the Defendant, including Draw #9 and the $13,000.00 draw for Reveiz Homes in making these advances. That is, the Plaintiff justifiably relied on the Defendant's representation when submitting each draw request that the funds would be disbursed by the Defendant and Reveiz & Gibbs in the manner required by the Construction Loan Agreement, i.e., solely for construction on the Wisteria Point Project. Thus, the only element to which there is any potential question is that of the Defendant's intent to deceive.

As the Plaintiff argued, under Tennessee law, "[u]se of the proceeds as enumerated in §§ 66-11-137 — 66-11-139 for any purpose other than either payment pursuant to written agreement between the parties or in accordance with the allocation of costs and profits under generally accepted

11

accounting principles for construction projects shall be prima facie evidence of intent to defraud."
TENN. CODE ANN. § 66-11-140 (Supp. 2010).  Of those enumerated statutes, only § 66-11-137 is
relevant to this case, and it, too, expressly includes a requirement that if construction loan proceeds
are used for purposes other than improving real property "with intent to defraud," the owner is liable
to an injured party for damages.  TENN. CODE ANN. § 66-11-137 (Supp. 2010).[10]

The Defendant does not dispute taking funds that were expressly designated for use on the
Wisteria Point Project and using them for other construction projects.  He testified that he did so
because he was trying to keep several projects afloat, and the fact that the Defendant and his business
ventures were having serious financial difficulties is easily discernable from the record.
Nevertheless, while his testimony that he intended to repay the funds to both Construction Design
and Management and the Plaintiff speak to whether he acted maliciously or with an intent to harm,
his stated intent to repay cannot override the fact that he admittedly obtained the proceeds from the
Defendant for Draw #9 with the intent to misappropriate them for purposes other than the Wisteria
Point Project.  The terms of the Construction Loan Agreement were clear:  the proceeds from the
Construction Loan were "to be used solely for construction on land located at 224 Maggie Mack

---

[10] (a) Any owner who procures a loan secured by a mortgage or other encumbrance on certain real
property, representing that the proceeds of the loan are to be used for the purpose of improving real
property, and who, with intent to defraud, uses the proceeds or any part of the proceeds for any other
purpose than to pay for labor performed on, or materials, services, equipment, or machinery furnished
for the real property, and overhead and profit related thereto while any amount for the labor, materials,
services, equipment, machinery, overhead or profit remains unpaid, or while any amount of which the
owner has received notice of nonpayment prescribed by this chapter remains unpaid, shall be liable
to an injured party for any damages and actual expenses incurred, including attorneys' fees, if the
damages and expenses incurred are the result of the misapplication of the loan proceeds.

(b) A violation of subsection (a) is a Class E felony.

TENN. CODE ANN. § 66-11-137 (Supp. 2010).

12

Lane, Sevierville, Tennessee 37862." TRIAL EX. 1 at ¶ 1.8.  The Defendant's use of the proceeds of

Draw #9 for other purposes, no matter what the purpose, constituted prima facie evidence under

Tennessee Code Annotated § 66-11-140 of his intent to defraud the Plaintiff.

Furthermore, the totality of the record weighs against the Defendant and points to his

subjective intent to deceive.  Although the court found his testimony that he took the funds received

through Draw #9 to pay expenses incurred on other projects in order to keep them from failing to be

credible, the court cannot say the same concerning the Defendant's testimony that he discussed

matters with Mr. Matlock before receiving Draw #9 or that Construction Design and Management

had agreed to loan him the $189,982.80 paid for Draw #9.  First, there was nothing in writing

concerning a loan arrangement between Construction Design and Management and the Defendant.

Similarly, there is no "paper trail" wherein Reveiz & Gibbs paid the requested draw to Construction

Design and Management, which then wrote a check or otherwise loaned the money to the Defendant

and/or Reveiz Homes.  Most persuasively, however, was the testimony of Mr. Matlock, who

emphatically denied not only being approached by the Defendant prior to the funding of Draw #9

but testified that he had been "shocked" to learn during a meeting with the Defendant in mid-April

2008, that the Defendant had "had to use" the money received for Draw #9 "to pay other things."[11]

Most conclusive, however, with respect to the Defendant's intent to deceive is the time line

of events which readily leads to the conclusion that when the Defendant requested Draw #9 from the

Plaintiff, he never intended to use the proceeds to pay Construction Design and Management for its

---

[11] Approximately a week after their meeting, Construction Design and Management received check #10028 for $50,000.00 of the $189,982.80 paid through Draw #9.  Mr. Matlock also testified that Construction Design and Management has not received the remaining $139,982.80 billed for Draw #9.

13

work on the Wisteria Point Project.  The Defendant testified as to his financial troubles in March

2008, which are evidenced by the bank records for Reveiz Homes.  *See* COLL. TRIAL EX. 15.  The

opening balance as of March 1, 2008, for the Reveiz Homes CBBC bank account was $1,812.52, but

as of March 19, 2008, Reveiz Homes had written check #30000 in the amount of $12,160.44 payable

to Witt Building Material Company, Inc. which was presented for payment on that date, had written

a check designated #99999 in the amount of $2,071.38 which was presented on that date, and had

made a deposit of $12,000.00 from Hardin Valley Development, LLC,[12] leaving the account, prior

to the deduction of a $32.00 NSF charge, with a negative balance of $451.30 on March 19, 2008.[13]

COLL. TRIAL EX. 15.  Additional checks were cut and made payable to venders and suppliers prior

to – and obviously in anticipation of – receipt of the proceeds from Draw #9.  Check #30023 in the

amount of $1,004.20 was presented and cleared the account on March 20, 2008, and fourteen checks

totaling $157,863.90, including check #30030 in the amount of $4,000.00 dated March 19, 2008,

payable to the Defendant, were presented and cleared the account on March 21, 2008, *following*

deposit of the $130,000.00 check #10018 from the R & G Construction Account to Reveiz Homes,

which occurred four days before the Plaintiff deposited the proceeds from Draw #9 into the R & G

Construction Account on March 25, 2008.[14]

---

[12] Hardin Valley Development, LLC was another of the Defendant's business ventures of which he held a 40% interest.  *See* COLL. TRIAL EX. 13.

[13] Due to the small print of the photocopied checks included within Collective Trial Exhibit 15, many of the payees' names are illegible.  *See* COLL. TRIAL EX. 15.

[14] Although the court cannot read the dates that many of these checks were cut by Reveiz Homes due to the fine print of the photocopied checks within Collective Trial Exhibit 15, many dates are discernable, and as to those the court cannot read, it is easily concluded that any checks which cleared the Reveiz Homes bank account on March 20 and 21 would have been written prior to those dates.  *See* COLL. TRIAL EX. 15.  Furthermore, as evidenced by the Reveiz Homes bank statement for March 2008, at the close of business on March 20, the account had a balance of $944.50, and as of the close of business on March 21, the account had a balance of $105,668.60.  COLL. TRIAL EX. 15.

14

Based on the record, the court finds that the Defendant received $202,982.80 from the Plaintiff representing the $189,982.80 associated with Draw #9 and the $13,000.00 draw request for "the underground electrical" from Reveiz Homes; that Reveiz & Gibbs and the Defendant received the proceeds from the $13,000.00 draw based upon misrepresentations made by the Defendant to the Plaintiff concerning the performance by Reveiz Homes of underground electrical work on the Wisteria Point Project in the amount of $13,000.00; that the Defendant submitted the Construction Design and Management Draw #9 knowing and intending to use those funds for purposes other than the Wisteria Point Project; that the Defendant took the proceeds paid by the Plaintiff for Draw #9 and the Reveiz Homes draw which were to be used solely for the Wisteria Point Project and used them for other construction projects and purposes; that the Defendant submitted the draw requests for Draw #9 and Reveiz Homes with a subjective intent to deceive the Plaintiff as to the use of the proceeds; and that the Plaintiff justifiably relied on the Defendant's representations, resulting in its losses.  Accordingly, the Plaintiff has proved by a preponderance of the evidence that it is entitled to a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A).

**B**

In order to be successful under § 523(a)(6), the Plaintiff must prove the existence of "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury[,]" *Kawaauhau v. Geiger*, 118 S. Ct. 974, 977 (1998), and that the Defendant either desired to cause the consequences of his actions or believed with reasonable certainty that such consequences would occur.  *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).  "That a

15

reasonable debtor 'should have known' that his conduct risked injury to others is simply insufficient. Instead, the debtor must 'will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.'" *Guthrie v. Kokenge (In re Kokenge)*, 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002) (quoting *Markowitz*, 190 F.3d at 465 n.10). Additionally, "the injury must invade the creditor's legal rights." *Steiner v. Best (In re Best)*, 109 Fed. Appx. 1, 6 (6th Cir. 2004). Accordingly, based upon Sixth Circuit authority, "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz*, 190 F.3d at 464; *Kokenge*, 279 B.R. at 543 (citations omitted).

"Although the 'willful' and 'malicious' requirements will be found concurrently in most cases, the terms are distinct, and both requirements must be met under § 523(a)(6)." *S. Atlanta Neurology & Pain Clinic, P.C. v. Lupo (In re Lupo)*, 353 B.R. 534, 550 (Bankr. N.D. Ohio 2006). "An act will be deemed 'willful' only if it was undertaken with the actual intent to cause injury," *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007), requiring the court to "look into the debtor's mind, subjectively" in order to determine whether the "debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act[.]" *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004). On the other hand, "[a]n act is 'malicious' if . . . it is undertaken 'in conscious disregard of one's duties or without just cause or excuse' . . . [and does] 'not require ill-will or specific intent to do harm.'" *Fox*, 370 B.R. at 119 (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). "The conduct 'must be more culpable than that which is in reckless disregard of

16

creditors' economic interests and expectancies, as distinguished from . . . legal rights. [K]nowledge that legal rights are being violated is insufficient to establish malice . . . .'" *Best*, 109 Fed. Appx. at 6 (quoting *In re Mulder*, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004)). In other words, "[l]ack of excuse or justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6)." *Lupo*, 353 B.R. at 550. Nondischargeability under § 523(a)(6) requires proof that the Plaintiff was injured and the Defendant's deliberate or intentional actions caused its injury, but "[m]ere negligence is not sufficient to except a debt from discharge under § 523(a)(6)." *Fox*, 370 B.R. at 119.

Acts of conversion may serve the basis for a determination of nondischargeability under § 523(a)(6). Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion of defiance of the owner's rights." *Thompson v. Thompson*, 2009 Tenn. App. LEXIS 99, at *45, 2009 WL 637289, at *14 (Tenn. Ct. App. Mar. 12, 2009); *see also Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property). "The main focus of the tort is the interference with an owner's property right[ and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion." *Gen. Elec. Credit Corp. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988). "[W]hile they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)." *Superior Metal Prods. v. Martin (In re Martin)*, 321 B.R. 437, 441 (Bankr. N.D.

17

Ohio 2004).  Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur.  *Sweeney v. Lombardi (In re Lombardi)*, 263 B.R. 848, 853 (Bankr. S.D. Ohio 2001).

Based upon the record, the court finds that the Plaintiff has not proved by a preponderance of the evidence that it is entitled to a nondischargeable judgment against the Defendant for willful and malicious injury under § 523(a)(6). Unquestionably, the Defendant misappropriated funds disbursed by the Plaintiff in Draw #9 and the Reveiz Homes draw that had been earned by Construction Design and Management and that were to be used solely for the Wisteria Point Project. Nevertheless, it is equally clear from the record that the Defendant did not willfully intend to injure the Plaintiff, nor were his actions malicious.  When he diverted the $189,982.80 from Draw #9 in March and April 2008, the Defendant was attempting to keep several fledgling projects afloat.  And although he used extremely poor judgment by improperly using the funds, the Defendant's testimony that he intended to repay both Construction Design and Management and the Plaintiff was credible, thus negating any malicious or willful intent.

## C

The Plaintiff has requested damages in the total amount of $330,680.80, which includes not only the remaining $139,982.80 not paid to Construction Design and Management from Draw #9, but also the $13,000.00 draw paid to Reveiz Homes, as well as $177,698.00 that the Plaintiff claims are unaccounted for.  *See* TRIAL EX. 8.  In essence, the Plaintiff seeks classic breach of contract

18

damages from the Defendant, the purpose of which "is to place the plaintiff as nearly as possible in the same position [it] would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than he would have been if the contract had been fully performed." *Cantrell v. Knox County Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)); *see also BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) ("Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties.") (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)).

It is well settled that the party seeking damages bears the burden of proving its entitlement thereto, and damages may not "be based on mere conjecture or speculation. . . . Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *see also Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 336 (Tenn. Ct. App. 1987). The court agrees that the Plaintiff has proved that, under the theory of breach of contract, it is entitled to a judgment against the Defendant for all monies advanced to the Defendant and Reveiz & Gibbs that were not used for the Wisteria Point Project. Nevertheless, the Plaintiff has not proved that all of the damages to which it might be entitled for breach of contract fall within the scope of damages which may be determined

19

nondischargeable under the Bankruptcy Code.[15]   The court will, therefore, limit the damages it awards the Plaintiff to those that are nondischargeable.

Section 523(a)(2)(A) covers money obtained through misrepresentation or fraud in the inducement.  The record is clear that there was no fraud in the Defendant's initial procurement of the Construction Loan with the Plaintiff for the Wisteria Point Project.  Additionally, the Plaintiff has not proved that there was fraud in the inducement up to and including the payment of draw requests made from May 2007 through February 2008.  It was the Defendant's request for the $189,982.80 associated with Draw #9 and the $13,000.00 draw request of Reveiz Homes that may rightfully be determined nondischargeable.  As discussed in detail, the Defendant requested Draw #9 in the amount of $189,982.80 with the intention of using it for purposes other than payment to Construction Design and Management on the Wisteria Point Project.  Regarding the $13,000.00, the Plaintiff has proved that Reveiz Homes did not legitimately perform underground electrical work for which it billed $13,000.00.  Mr. Matlock's un-rebutted testimony was that once Construction Design and Management began working on the Wisteria Point Project in May 2007, Reveiz Homes did not thereafter perform any significant work on the site; that he could not recall any underground electrical work being performed in February or March 2008; and that he was not aware that the $13,000.00 invoice had been submitted along with his company's Draw #9.  Accordingly, the amount to which the Plaintiff is entitled to a nondischargeable judgment is limited to the $139,982.80 from Draw #9 which was received by Reveiz & Gibbs but paid to Reveiz Homes and

---

[15] In fact, the $139,982.80 balance due from Draw #9 and the $13,000.00 from the Reveiz Homes draw are the only damages proved with specificity.  The Plaintiff offered no proof on what comprises the $177,698.00 "[a]mt to be reimbursed by Reveiz Homes" figure referenced in Trial Exhibit 8.  Arguably, as stated by the Defendant's attorney in closing argument, the $177,698.00 figure includes the $152,982.00 from Draw #9 and the Reveiz Homes draw.

not to Construction Design and Management plus the $13,000.00 Reveiz Homes draw for underground electrical work.

### III

In summary, the court finds that the Plaintiff is entitled to a judgment in the amount of $152,982.80, and that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

A Judgment consistent with this memorandum will be entered.

FILED:  March 22, 2011

BY THE COURT

/s/  *RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE